UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DICKIE COLWELL,

                Plaintiff,           Case No. 11-cv-15586
                                    Honorable Stephen J. Murphy, III
                                    Magistrate Judge David R. Grand

v.

CORIZON HEALTHCARE, et al.,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [64]**

**I.     RECOMMENDATION**

This matter comes before the Court on defendants Corizon Healthcare ("Corizon"), Adam Edelman, and Rich Hallworth's[1] motion for summary judgment. [64]. The matter has been fully briefed by the parties, and the Court finds that oral argument would not aid it in disposing of the motion. E.D. Mich. L.R. 7.1(f). For the following reasons, the Court RECOMMENDS that Defendants' motion [64] be GRANTED.

**II.    REPORT**

    **A.     Background**

        ***1.     Factual***

Plaintiff Colwell is an inmate at the Michigan Department of Corrections' ("MDOC") Cotton Correctional Facility. [1]. Defendant Adam Edelman is a doctor employed by defendant Corizon, an MDOC contractor that provides medical care to MDOC inmates. [64-2 (Affidavit of

_____

[1] Defendant Hallworth is improperly named in the complaint as "Hollworth".

Adam Edelman) ¶ 1; Plaintiff's Exhibit ("P.E.") 107].  At the times relevant to this matter, Edelman was tasked with reviewing treating physician requests for various medical procedures, including radiographic films, specialist consultations and surgery.  [64-2 ¶ 1-2; Colwell 72, 96, 107].[2]  Defendant Hallworth was, at all times relevant to this matter, the Chief Executive Officer of defendant Corizon.  [64 at 28].

Colwell was diagnosed and treated for HIV and Hepatitis C while in prison.  One of the medications Colwell was taking in relation to his HIV caused an increase in his bilirubin level, which can cause a yellowing of the skin, or jaundice.  (Colwell 12; 132).  In May 2006, Colwell underwent an ultrasound of his liver, which revealed the presence of gallstones.  (Colwell 51).  The gallbladder is a pear-shaped organ under the liver.  [64-2, Affidavit of Defendant Adam Edelman ¶ 3].  It stores bile, a fluid made by the liver to help absorb fat.  *Id.*  As the stomach and intestines ingest food, the gallbladder releases bile through a tube called a common bile duct.  *Id.*  This duct connects the gallbladder and liver to the small intestine.  *Id.*  Gallstones form when substances in bile harden.  *Id.*  Cholelithiasis, or gallstones, in and of itself is a benign condition that can remain asymptomatic for many years.  *Id.*  Patients can experience "biliary colic" from cholelithiasis.  *Id.* ¶ 4.  Biliary colic occurs when a gallstone transiently obstructs a bile duct.  *Id.*  The symptoms of biliary colic include pain in the right upper quadrant or on the back under the shoulder blade, nausea and vomiting, and usually occur after a fatty meal.  *Id.*  The symptoms are transient, lasting a few minutes to a few hours.  *Id.*  The pain with biliary colic is significant, but biliary colic is benign absent evidence of other complications.  *Id.*  Episodic biliary colic can be managed conservatively through analgesics (pain medication) and avoidance of fatty foods.  *Id.*  Cholelithiasis is treated surgically when the patient exhibits evidence of complications, such as

---

[2] The designation "Colwell" refers to Colwell's medical records, filed by Defendants under seal in this matter.

cholecystitis.  *Id.*  Cholecystitis is inflammation of the gallbladder.  *Id...*  Unlike biliary colic, the pain from cholecystitis does not abate and occurs with constitutional symptoms such as malaise and fever.  *Id.*

On a sick call in June 2010, Colwell complained of pelvic pain and burning, with difficulty urinating.  (Colwell 38).  Upon exam, his abdomen was noted as being tender.  *Id.*  At an August 2010 follow-up regarding lab results, Colwell reported that his mother had been diagnosed with stage IV liver cancer, and that he was concerned about "a questionable mass that he palpated on the right side of his abdomen."  (Colwell 43).  He had no other concerns.  *Id.*  Upon exam, his vital signs were normal.  *Id.*  His abdomen was non-tender and negative for palpable masses.  (Colwell 44).  Colwell reiterated his concern about a mass in a kite he sent on September 6, 2010.  (Colwell 45).  He was informed that he would be seen the following week. *Id.*

On September 15, 2010, Colwell was seen by Dr. Zivit Cohen and reiterated his concern about a lump on the right side of his abdomen.  (Colwell 47).  Upon exam, vital signs were normal.  *Id.*  Palpation revealed a 3x3 cm mobile mass in his right upper quadrant, but no abdominal tenderness, guarding or rebound.  (Colwell 48).  Dr. Cohen requested an abdominal x-ray with possible follow-up for an abdominal ultrasound, and put Colwell on light duty.  (*Id.*; Colwell 46).  An x-ray taken on September 21, 2010 revealed a normal abdomen.  (Colwell 50).

Colwell was seen by Dr. Craig Hutchinson, an infectious disease specialist following Colwell for his HIV and Hepatitis C, via telemed on October 1, 2010.  (Colwell 51).  He reported the mass in his right upper quadrant, which he stated was confirmed by his primary care physician, but not seen in abdominal films.  *Id.*  His vital signs were normal on exam.  *Id.*  Dr. Hutchinson concluded that he "would consider an ultrasound of the liver if this mass is plausibly

related to the liver or the gall bladder," given Colwell's history of gallstones first discovered in 2006, as well as the results of a liver biopsy that same year showing stage 3 fibrosis, which increases the risk of hepatoma.  *Id.*  On October 4, 2010, Colwell's primary care physician requested a liver ultrasound, which was approved.  (Colwell 53-55).  The ultrasound revealed a minimally heterogeneous liver and a "prominently distended [gallbladder] with multiple mobile stones and sludge" but no gallbladder wall thickening, pericholecystic fluid or bile duct dilation. (Colwell 57; 176).  Upon exam, Colwell's vital signs were normal.  *Id.*  He was found in no acute distress and with no abdominal tenderness.  (Colwell 58).  A palpable mass was noted in the right upper quadrant, but was only felt on deep palpation in a seated position.  *Id.*

On November 8, 2010, Colwell kited medical, requesting a biopsy of the mass, noting that his mother died recently of gall bladder/liver cancer.  (Colwell 59).  Medical responded that what Colwell was feeling was his gallbladder.  *Id.*  On January 4, 2011, Colwell again kited medical, reporting "very serious and painful symptoms assoc[iated] with the gallstones he has" including inflammation, nausea, vomiting, and pain in his rib cage, lower back, and near the shoulder blade.  (Colwell 64).  He was informed that a nurse sick call would be scheduled.  *Id.* The request was cancelled, however, when it was revealed that Colwell had an appointment with his practitioner already scheduled for January 6.  (Colwell 65).  It is unclear whether he saw anyone on that date, however, as on January 10, 2011, he again kited medical about his condition.  (Colwell 66).  He was seen by Dr. Nancy McGuire on January 11, 2011, presenting with right upper quadrant pain that he described as "colicky" and radiating to his back and chest. (Colwell 69).  No pattern was noted for the pain, and he was noted to have a history of gallstones and an elevated bilirubin level.  *Id.*  Upon exam, he was noted to be in no acute distress, and his vital signs were normal.  *Id.*  He was noted to have slightly icteric sclera and upper abdominal

tenderness, although no mass was palpable.  (Colwell 70).  Dr. McGuire put in a request for a surgical consult "as he is symptomatic."  (*Id.*; Colwell 67-68).  This request was forwarded by a doctor to defendant Edelman for approval.  (Colwell 71-72).  Edelman denied the request, noting that "[n]o lab or [vital sign] abnormalities [were] associated with this" and that while Colwell's bilirubin was elevated, it was not due to gallstones as two other indicators, alkaline phosphates and "GGT" (gamma-glutamyl transpeptidase) were "normal."  (Colwell 72); [64-2 at ¶ 5].  High GGT and alkaline phosphatase levels are indicative of biliary stasis, or a slowing of bile movement, which is evidence of bile duct obstruction.  [64-2 at ¶ 5].  Edelman recommended to "treat conservatively, encouraging avoidance of fatty foods, etc."  (Colwell 72).  Edelman avers that this would include the prescription of analgesic medication, although he did not so specify in his directions to Dr. McGuire.  [64-2 at ¶ 8].

Subsequent to this denial, Colwell sought consultation with a dietician and requested a high protein, low sugar diet.  (Colwell 73).  The dietician denied his request, noting that MDOC does not have such a meal option, and recommended that he "follow healthy meal options to decrease 'sugar' and fat."  *Id.*  On February 8, 2011, Colwell kited medical, noting that he had not gotten his requested diet and that his "pain from his gallstones is increasing in frequency and intensity."  (Colwell 77).  A nurse sick call was scheduled.  *Id.*  Colwell saw the nurse on February 10, 2011.  (Colwell 78).  He continued to report increased and more frequent pain from his gallstones.  *Id.*  He further reported that he had been trying to watch his diet and keep it high protein, low fat and low sugar.  *Id.*  Upon exam, Colwell was noted to not be in any acute distress.  *Id.*  His vital signs were normal.  (Colwell. 78-79).  Right upper quadrant tenderness was noted on palpation.  (Colwell 78).  The nurse noted that Colwell would have an appointment "with Dr. Miles to discuss surgery options on 2/18/10."  *Id.*  On the same day, a telemed

appointment with the dietician revealed that Colwell did not need any change in his diet, as he was already following a low fat diet.  (Colwell 80).

Colwell was seen by Dr. McGuire on February 18, 2011 for a health assessment, where he again presented with "gallbladder issues."  (Colwell 84).  He reported right upper quadrant pain with radiation to the shoulder, nausea and diarrhea.  (Colwell 86).  Upon exam, his vital signs were normal  (Colwell 84).  There was no abdominal tenderness and no hepatic tenderness or enlargement.  (Colwell 87).  Dr. McGuire reported having consulted with Dr. Hutchinson, who noted that since Colwell's previous ultrasound had not detected gallbladder wall thickening or pericholecystic fluid, they could just "watch the patient."  *Id.*  On March 9, 2011, Colwell sent a kite to medical asking about the "details of conservative treatment prescribed for gallstones vs[.] surgery."  (Colwell 88).  It was noted that the request would be forwarded to the medical practitioner "for chart review."  *Id.*

Cowell was seen by Dr. McGuire again on March 22, 2011, reporting constant, stabbing pain in his right upper quadrant radiating to the shoulder and back, accompanied by bloating, hot flashes, itching and loose stools.  (Colwell 91; 93).  He reported having 3-4 loose stools a day.  (Colwell 93).  Dr. McGuire noted that Colwell had failed his outpatient therapy of "changing diet to decrease fat."  (Colwell 91).  Upon exam, Colwell's vital signs were normal.  (Colwell 93).  Right upper quadrant abdominal tenderness was noted.  (Colwell 94).  Colwell asked whether there was medication available to dissolve the stones.  *Id.*  Dr. McGuire requested a gastroenterological consultation as a result of Colwell's symptoms, but did not prescribe any other treatment for his condition.  (Colwell 91-93).  On March 25, 2011, defendant Edelman refused this request, stating that it was "not clear why we would need GI consultation.  No lab or vital sign abnormalities associated with these episodes.  Follow on sight, treat symptomatically.

6

Call Dr. Jenkins" as needed.  (Colwell 96).

On April 2, 2011, Colwell sent a kite to medical requesting information about obtaining a second opinion at his own expense, as was suggested in the response to his Step II grievance on the subject.  (Colwell 97).  He was informed that he would need to talk to his unit supervisor or counselor as health care "does not take care of these issues."  *Id.*  On March 28, 2011, Colwell kited medical complaining of worsening symptoms, including tenderness, hot flashes, itching and night sweats.  (Colwell 98).  He also requested medications to dissolve his gall stones "or some other treatment."  (Colwell 99).  A nurse sick call was scheduled.  (Colwell 98).  It is unclear whether a sick call took place, however, as on April 13, 2011, Colwell again kited medical complaining that he had not received treatment for his gallstones and wanted to know when his next doctor appointment was.  (Colwell 100).  He was informed that he would be seen "within the next week to two," and that a nurse visit was also scheduled.  *Id.*

Colwell was seen by the nurse the following day, presenting with what he described as progressively worse symptoms, including nausea, right upper quadrant pain radiating to back and right shoulder blade, low grade fever, diarrhea and belching.  (Colwell 101).  At this initial exam, Colwell's temperature was 99.4, and he was found to be "in pain and distressed" with right upper quadrant pain and tenderness to palpation, but his other vital signs were normal.  (*Id.*).  His sclera was noted to have "a very light tinge of yellow" and the skin surrounding his orbits was also noted to be yellow.  *Id.*  The nurse contacted the doctor "right away," and physician assistant J. Campbell examined Colwell and ordered a urinalysis and blood work.  (Colwell 101-103).  Colwell described his pain to PA Campbell as "sharp/stabbing, with waxing/waning course, lasting minutes before resolving on its own."  (Colwell 102).  He reported that it was aggravated by "deep breathing or applying pressure to the region."  (*Id.*).  He denied any vomiting, blood in

his stool, or unintentional weight loss. *Id.* And, consistent with his report that his pain would resolve on its own within "minutes," just an hour after the nurse found Colwell to be in pain and distressed (Colwell 101), PA Campbell found him to be in "[n]o acute distress" (though he still exhibited right upper quadrant tenderness on palpation and "guarding"). (Colwell 102). PA Campbell ordered a Toradol shot for Colwell, but none was given because there was "no current supply." (Colwell 103). Instead, Colwell received "2 samples of Motrin" to take for pain. *Id.* PA Campbell also requested an updated gallbladder ultrasound "to evaluate for fluid collection, wall thickening or obstruction," which was forwarded by Dr. Shepherd to defendant Edelman. (Colwell 104-107). On April 19, 2011, Edelman denied the request, finding that the criteria for the procedure was not met, which decision he based on his conclusion that "elevated bili in this patient is likely due to Gilbert's disease (benign). One will not experience a bili bump without GGT o[r] alk phos (which are the 2 most sensitive indicators of biliary stasis) elevations. There are no vital sign changes consistent with distress." (Colwell 107). He recommended that the doctor "call your RND to discuss" and "follow up prn" (as needed). (*Id.*). This was the last time Edelman was directly involved in Colwell's treatment decisions.

Colwell returned to Dr. McGuire on April 22, 2011, complaining of "constant" abdominal pain, night sweats, weight loss, nausea and loose stools. (*Id.*). He was found in no acute distress, however, but "[s]omewhat anxious." (Colwell 111). His vital signs were normal. (Colwell 108). He showed no abdominal tenderness at this appointment. (Colwell 111). He asked about medication to dissolve his gallstones, but was informed that he would not benefit as "he has many stones" and that the medication could negatively interact with his hepatitis and HIV medications. *Id.* Dr. McGuire stated that Colwell should return in a month, and she put him on light duty detail for six months. *Id.*

8

Colwell treated with Dr. Bhamini Sudhir on April 26, 2011, again complaining of pain in his right upper abdomen, radiating to the back and right shoulder and significant tenderness. (Colwell 115).  He reported that "achy" abdominal pain, which he rated at 3-4 out of 10, is present all the time, but worse after eating, and "sharp" (8/10) with a deep intake of breath.  *Id.*  He also reported nausea and bloating after meals and after taking medication.  *Id.*  Upon exam, however, Colwell was in no apparent distress, and his vital signs were normal.  (Colwell 113).  There was tenderness noted upon palpation in his right upper quadrant, but no rebound or guarding.  (Colwell 115).  No "palpable masses" were felt.  *Id.*  Dr. Sudhir concluded that he would review the chart and "put in for surgery if needed" but noted that there was "[n]o acute abdomen at this point" and recommended unspecified "[s]ymptomatic treatment."  (Colwell 116).

On May 6, 2011, Colwell saw the nurse, complaining of nausea and bloating that was becoming more frequent and intense and that he was suffering from heartburn.  (Colwell 117).  His vital signs upon exam were normal.  *Id.*  Colwell was seen by Dr. McGuire on May 24, 2011, still complaining of abdominal pain, bloating, diarrhea, flatulence and nausea.  (Colwell 118).  He reported trying to modify his diet by avoiding fatty foods.  *Id.*  His vital signs were normal on exam, and "[s]ome yellowing of sclera" was noted.  *Id.*  He was also noted to have right upper quadrant tenderness.  (Colwell 119).  Colwell again asked about medicine to dissolve the stones, but Dr. McGuire reiterated her prior statements about why it would not work.  *Id.*  She reported that she would discuss the case with Dr. Hutchinson and that they may need to get a more recent ultrasound.  *Id.*

Colwell treated with Dr. McGuire again on June 24, 2011, reporting constant right upper quadrant pain that radiated to right shoulder blade and back of shoulder that was worse on some

days.   (Colwell 120).   He also reported indigestion with food consumption, night sweats, bloating, decreased appetite, diarrhea, jaundice and nausea.   (Colwell 120-21).   Dr. McGuire noted that his lipase and amylase values had been within normal limits.   (Colwell 120).   Upon exam, Colwell was found in no acute distress, with a blood pressure reading of 135/92 and a slight yellowing of the sclera.   (Colwell 121).   He had right upper quadrant as well as hepatic tenderness.   *Id.*   His condition was noted as fair and he was given Tums, as requested, for indigestion.   *Id.*   He was also to be monitored for elevated blood pressure.   *Id.*   On July 13, 2011, Colwell requested an appointment to discuss his gallstones, and was informed he had an appointment scheduled for August 5, 2011.   (Colwell 123).   On July 17, 2011, Colwell requested a refill of Tums, stating that they helped with his reflux and indigestion.   (Colwell 124).

Colwell treated again with Dr. McGuire on August 5, 2011, complaining of right upper quadrant pain radiating to the back right shoulder blade.   (Colwell 125).   He also complained of anxiety, depression, diarrhea, fatigue, insomnia, nausea, night sweats and weight gain.   *Id.*   It was noted that his scheduled appointment with Dr. Hutchinson had been cancelled due to an emergency count.   *Id.*   Upon exam, his vital signs were normal and he was found in no acute distress.   *Id.*   Right upper quadrant tenderness was noted and his condition was rated as "fair." *Id.*   Dr. McGuire said she would try to find out when Colwell's next appointment with Dr. Hutchinson was scheduled.   *Id.*   Dr. McGuire again saw Colwell on September 6, 2011. (Colwell 127).   She noted that his appointment with Dr. Hutchinson was scheduled for October. *Id.*   Colwell reported abdominal pain, anxiety, depressed mood, diarrhea, fatigue, nausea, night sweats and weight gain.   *Id.*   Dr. McGuire noted that Colwell had not made any interval care visits since his last appointment with her.   *Id.*   Upon exam, Colwell's vital signs were normal and he was in no acute distress.   *Id.*   Right upper quadrant tenderness was noted.   (Colwell 128).   His

condition was rated as fair, and he was advised to return if he had any increased symptoms.  *Id.*
He was given a bottom bunk assignment and a light duty restriction.  *Id.*  On September 11,
2011, Colwell kited medical, reporting considerable pain due to an inflamed gallbladder.
(Colwell 129).  The response was "Because you kite with symptoms, per policy you have to be
scheduled to be seen by Nursing.  You do not have another MP apt scheduled until Oct."  *Id.*  It
is unclear whether Colwell was seen by a nurse for these symptoms.

Colwell returned to Dr. McGuire on October 4, 2011.  (Colwell 130).  He complained of
abdominal pain, diarrhea, nausea, fatigue and night sweats.  *Id.*  Upon exam he was found in no
acute distress and his vital signs were normal.  (Colwell 131).  No abdominal tenderness was
noted and his condition was rated as fair.  *Id.*  Dr. McGuire noted that Colwell was to see Dr.
Hutchinson soon and that she would see him back after that appointment.  *Id.*  She gave him an
order for continuous access to the toilet.  *Id.*  On October 15, 2011, Colwell kited medical,
reporting an increase in lower back and right shoulder pain from his gallstones and requested to
be seen.  (Colwell 133).  He was informed that a nurse sick visit would be scheduled, but the
record before the Court does not contain notes of such an appointment.  *Id.*  On October 25,
2011, Colwell engaged in a telemedicine consultation with Dr. Hutchinson.  (Colwell 132).
Colwell noted a concern about his bilirubin level, which Dr. Hutchinson noted was an effect of
his HIV medicine, Reyataz.  *Id.*  His vital signs were normal except for a low grade fever of 99.3.
*Id.*  Due to Colwell's elevated bilirubin level as well as his right upper quadrant pain, "which he
says is present continuously but often exacerbated after meals, occasionally associated with
nausea and occasionally radiating to his scapula" the doctor reviewed the October 2010
ultrasound, and noted that it showed no wall thickening or fluid.  *Id.*  He advised that he would
order additional labs in January 2012 and "respond as needed," following up in late April 2012.

*Id.*

Colwell returned to Dr. McGuire on November 18, 2011, continuing to complain of right upper quadrant pain, radiating to his right scapula and shoulder, accompanied by nausea, vomiting, night sweats and anxiety. (Colwell 140). He reported pain upon deep breathing and that his anxiety had been so bad that he had to treat with mental health and go back on medication. *Id.* Upon exam, Colwell's vital signs were normal except for a low grade fever of 99.0. *Id.* Right upper quadrant tenderness was noted, as was slight scleral icterus. (Colwell 141). His prognosis was evaluated as poor that she would schedule him for a pain clinic consultation in 2-3 weeks. *Id.*

On November 16, 2011, Colwell's fiancée wrote a letter which she sent to defendant Hallworth, the CEO of Corizon Healthcare and Dr. Harriet Squire, the director of operations for Corizon at MDOC facilities. [Plt. Ex. 89; 64-4 at 6-8]. On December 8, 2011, she also sent a copy of this letter to Karen Mason, director of quality improvement at Corizon. [64-5 at 7]. In the letter, she outlines Colwell's treatment to date, and states that she believes that Dr. Edelman's denial of certain care to Colwell is a constitutional violation. [Plt. Ex. 89; 64-4 at 6]. She included a number of pages of Colwell's medical record, as well as several articles on the issue of gallstones. [64-4 at 6-37]. According to Briana Anderson, the associate patient safety officer with Corizon, all inmate letters sent to Hallworth would be directed instead to the Compliance Department for evaluation and response. [64-4, Affidavit of Briana Anderson, ¶ 3]. Anderson reviewed the records pertaining to these letters and found the letter from Colwell's fiancée. *Id.* ¶ 5. She noted that any letters that had been personally reviewed by defendant Hallworth would be initialed by him, and that this letter had not been so initialed, denoting that he had not personally reviewed it. *Id.* According to her records, the letter was initially sent to Drs. Erin Orlebeke and

Sylvia McQueen to evaluate the complaints therein.  *Id.* ¶ 6.  Dr. Orlebeke was the State Medical Director and Dr. McQueen was the Vice President of Clinic Services for the State of Michigan. *Id.*

On November 29, 2011, a note from Dr. Hutchinson reveals that he discussed the case with Dr. McGuire, who had recently found a report of Reyataz being implicated in biliary stone formation, "and it is well known to cause renal stones."  (Colwell 143).  As a result, Dr. Hutchinson substituted Lexiva for Reyataz.  *Id.*  He did not prescribe any other treatment for Colwell's gallstones.  *Id.*  On December 2, 2011, Colwell presented to Dr. McGuire with pain and nausea.  (Colwell 146).  His vital signs were normal, and right upper quadrant tenderness was present on examination.  (Colwell 146-47).  Dr. McGuire noted the changed medication order from Dr. Hutchinson.  (Colwell 146).  She also stated that a "407 (a request for a medical procedure) which was place[d] in January 2011 has now been rescinded and a request for submission of a new 407 for surgical consult has been verbally authorized."  *Id.*  She did not state who rescinded the previous denial of surgery or who verbally authorized the request for a new submission, nor did she state upon what criteria this action was based.  *Id.*  The request for a surgical consultation was approved by Dr. Erin Orlebeke on December 5, 2011.

On December 19, Karen Mason, apparently for the first time, received the letter sent to her office, via the email of an administrative assistant.  [64-5 at 6].  On the same day, she sent the letter to Drs. Steven Bergman, Erin Orlebeke, defendant Edelman and a "Thomas Smith."  *Id.* at 5.  She notes that Colwell's fiancée "does make a threat to sue" and that it "appears she has also sent a copy to the corporate office."  *Id.*  Dr. Bergman filed an affidavit in this case stating that he received this request to review Colwell's chart on December 19, and that by the time of his involvement in the case, Colwell's "conservative treatment plan had been given a fair trial and

13

the patient remained symptomatic." [64-6 at ¶6]. In addition, he avers that Dr. McGuire's location of research that connected Reyataz with gallstones precipitated the decision to go forward with surgery as the next step. *Id.*

On December 27, 2011, Colwell underwent a surgical consultation with Dr. Prough, who recommended a laparoscopic cholecystectomy "ASAP." (Colwell 150). The request was approved by Dr. Squier on January 4, 2012. (Colwell 154). On February 7, 2012, Dr. Bergman sent an email back to Karen Mason stating that he had "been working with JCF to try to get this resolved. Inmate Colwell does have a documented case of cholelithiasis and is now scheduled for surgical removal this Friday." [64-5 at 5].

Colwell underwent a laparoscopic cholecystectomy on February 10, 2012, which resolved his symptoms. (Colwell 158; 161). The day prior to surgery, it was noted that he presented "with a clinical picture consistent with biliary colic," as there was "no evidence of acute inflammatory changes" and "[n]o bile duct dilation." (Colwell 171). The doctor stated that, "[i]n light of this and the documented gallstones, it was suggested that he consider cholecystectomy, not only to hopefully alleviate his symptoms, but to obviate the potential development of acute cholecystitis or choledocholithiasis. (Colwell 167). Upon exam, Colwell was again noted to be in no acute distress, with right upper quadrant pain and "mild guarding on deep palpation" but otherwise only mildly tender. *Id.* His vital signs appear to not have been taken prior to surgery. *Id.* Post-operatively, Colwell's diagnosis was cholecystitis. (Colwell 164). During surgery, it was noted that Colwell's gallbladder was "tense and inflamed" and contained "'white bile', findings consistent with cholecystitis and an obstructed cystic duct." (Colwell 165).

14

### 2.    Procedural

Colwell filed the instant complaint on December 21, 2011, prior to receiving his gallbladder removal surgery.  [1].  In addition to the instant defendants, Colwell sued the nutritionist, Megan Dziedzic, MDOC employees Dan Heynes, Debra Scutt, and Grievance Coordinator McMillan, as well as Corizon nurses M. Creger, Mary Wilson and Laura Kinder, and a John Doe defendant.  [1].  On March 5, 2012, the Court *sua sponte* dismissed defendants Heyns, Kinder, McMillan, Scutt, Wilson, Creger and Doe, for failure to state a claim upon which relief could be granted under 28 U.S.C. § 1915, and directed service on the remaining defendants.  [6].  Colwell's "objections" to that order were overruled on July 5, 2012.  [10].  On February 25, 2013, defendant Dziedzic moved for summary judgment, a motion this Court recommended granting on April 12, 2013, a recommendation that was adopted over Colwell's objection on September 24, 2013.   [34, 38, 61].   Some discovery was conducted by the remaining parties, and on November 18, 2013, the remaining defendants filed the instant motion for summary judgment.  [64].  On June 26, 2014, Colwell moved for appointment of counsel. [81].[3]

### B.    Legal Standards

Federal Rule of Civil Procedure 56 provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of material fact

---

[3] On the basis of the Court's present recommendation, Colwell's motion for appointment of counsel will be denied without prejudice in a separate order.

15

exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In response to a summary judgment motion, the opposing party may not rest on its pleadings nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id*. (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id*. at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## C.      Analysis

Defendants move for summary judgment on three bases. First, they argue that Colwell's claims against defendant Edelman must fail as a matter of law because Colwell has not created a

16

dispute of material fact that Edelman was deliberately indifferent to his serious medical needs as required by the Eighth Amendment. They further argue that Colwell's claims against defendant Hallworth must fail because Colwell has not raised a material dispute of fact that Hallworth was not personally involved in Colwell's case, or that even if personal involvement could be inferred, he was nevertheless not deliberately indifferent to Colwell's serious medical needs. Finally, they argue that Corizon was not deliberately indifferent through a failure to train or supervise either defendants Edelman or Hallworth.

### 1.    *Defendant Edelman*

In his complaint, Colwell alleges that Defendant Edelman violated his Eighth Amendment right to be free from cruel and unusual punishment by denying his treating doctors' requests for medical services related to his cholelithiasis, namely Edelman's denial of the request for surgery, for a GI consultation, and for an updated ultrasound of Colwell's gallbladder. (Colwell 72, 96, 107). The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain" upon inmates. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (internal citations omitted). "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Corizon employees act "under color of state law" for purposes of the Eighth Amendment and § 1983 analyses because MDOC has contracted with Corizon for Corizon's employees to provide medical services to inmates on MDOC's behalf. *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (reiterating well-settled law that those contracted to provide care in MDOC facilities act "under color of state

17

law" and are subject to suit under § 1983, stating that "contracting out prison medical care does

not relieve the State of its constitutional duty to provide adequate medical treatment to those in

custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth

Amendment rights.").

The Sixth Circuit recently explained the standards that a plaintiff inmate must satisfy to

state a claim for deliberate indifference to his serious medical needs:

> A claim of deliberate indifference under the Eighth Amendment has both
> an objective and a subjective component.   The objective component
> requires the existence of a sufficiently serious medical need.   To satisfy
> the subjective component, the defendant must possess a "sufficiently
> culpable state of mind," rising above negligence or even gross negligence
> and being "tantamount to intent to punish."   Put another way, "[a] prison
> official acts with deliberate indifference if he knows of a substantial risk to
> an inmate's health, yet recklessly disregards the risk by failing to take
> reasonable measures to abate it."   Mere negligence will not suffice.
> Consequently, allegations of medical malpractice or negligent diagnosis
> and treatment generally fail to state an Eighth Amendment claim of cruel
> and unusual punishment.

*Broyles v. Correctional Medical Servs., Inc.*, 478 Fed. Appx. 971, 975 (6th Cir. 2012) (internal

citations omitted).

Moreover, a plaintiff must demonstrate that a prison official knew of and disregarded an

excessive risk to inmate health or safety by showing that (1) the official was aware of facts from

which an inference could be drawn that a substantial risk of serious harm existed, and (2) the

official actually drew the inference.   *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   As the

Sixth Circuit has recognized, the requirement that the official subjectively perceived a risk of

harm and then disregarded it is "meant to prevent the constitutionalization of medical

malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than

negligence or the misdiagnosis of an ailment."   *Comstock v. McCrary*, 273 F.3d 693, 703 (6th

Cir. 2001).   The *Comstock* court further explained:

18

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.' Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'

*Id.* (internal citations omitted).

Neither party appears to dispute that Colwell's cholelithiasis was a "serious medical condition." Therefore, the question before the Court is whether, in denying the three particular requests in issue, Edelman "knew of and disregarded an excessive risk" to Colwell's health and safety. The Court addresses each denial individually.

### a.   Denial of Surgery

Edelman's first denial was based on the fact that Colwell's examination revealed no vital sign abnormalities associated with the episode, nor elevated GGT or alkaline phosphate levels to correspond the alleged pain with bile duct obstruction. (Colwell 72). Edelman's opinion was that absent these indicators, Colwell's elevated bilirubin level was not due to gallstones. *Id.* As a result, he recommended that Colwell's condition be "treat[ed] conservatively, encouraging avoidance of fatty foods, etc." *Id.* In his affidavit, Edelman avers that episodic biliary colic, the symptomatic version of cholelithiasis, can be treated conservatively with analgesics and diet modification. [64-2 ¶3]. He further avers that although he did not specify treatment with analgesics in his denial, a recommendation for conservative treatment would be interpreted to include such a recommendation. *Id.* ¶8. Edelman avers that a person only becomes in need of surgery when his condition progresses from cholelithiasis to cholecystitis, a progression marked by symptoms Edelman noted in his denial that Colwell did not possess, including elevated blood levels of GGT and alkaline phosphates, and constant severe pain objectively verified by findings

19

of guarding or rebound upon palpation and elevated vital signs, such as fever, increased pulse rate, respiration rate and blood pressure.  *Id.* ¶¶5, 7.

The record evidence supports that Colwell did not exhibit the symptoms Edelman avers are required for cholecystitis.  First, Dr. Hutchinson had previously informed Colwell that his Reyataz would and did cause his elevated bilirubin levels.  (Colwell 12, 132).  Further, upon exam on the day the surgical request was made, Colwell was noted to be in no acute distress, his pain followed no pattern and his vital signs were normal.  *Id.* at 69-70.  Upon palpation he exhibited only tenderness, and no guarding or rebound was noted.  *Id.*

In his response, Colwell cites to and attaches numerous medical articles (some identifiable and some not) that state in part that a person with cholelithiasis or even cholecystitis may not exhibit any of the signs that Edelman avers are required, such as elevated GGT and alkaline phosphate levels, or elevated vital signs.  [*See generally* P.E. ##68-87; 114; 115].  He further cites these articles for the position that the only appropriate treatment for symptomatic cholelithiasis is surgery, making the risk to his health and safety "obvious" and thus permitting an inference that Edelman knowingly disregarded that obvious risk.  *Id.*  Colwell's arguments are not persuasive.

It should first be noted that the Court cannot consider these articles on a motion for summary judgment, as they constitute hearsay under the Federal Rules of Evidence and are not covered by any of the exceptions to those rules.  *Flones v. Beaumont Health System*, --- Fed. App'x ---, 2014 WL 2497557 at *5 (6th Cir. June 4, 2014) )("it is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion.").  Although Federal Rule of Evidence 803(18) does provide a hearsay exception for "learned treatises," such documents are only admissible "[t]o the extent called to the attention of an expert

20

witness upon cross-examination or relied upon by the expert witness in direct examination." *Id.* Colwell fails to present these medical articles in conjunction with expert testimony, either of his own expert or in the context of a deposition of Dr. Edelman, and thus they are inadmissible to rebut Edelman's averments as to his subjective understanding of Colwell's condition, and the reasonableness of his actions in addressing those conditions. *Cornelius v. Wilkinson*, No. 05-545, 2006 U.S. Dist. LEXIS 58207, *13-14 (N.D. Ohio Aug. 18, 2006). Outside of this evidence, Colwell offers nothing to create a dispute of material fact as to whether Edelman knowingly disregarded a substantial risk to Colwell's health and safety.

Moreover, even if the Court were able to consider these articles, the result would not change. The articles merely suggest that surgery is generally the course of action to be taken when faced with symptomatic cholelithiasis. But whether surgery is "the most effective" course of action to take with respect to symptomatic cholelithiasis [P.E. #68 at1] is not the relevant issue before this Court. Nor is it relevant that a person who requires surgery may or may not exhibit the symptoms Edelman believed were required. Against the unrebutted evidence supplied by Edelman, the materials presented by Colwell would show, at most, that Edelman inaccurately assessed his condition, and denied the surgical consultation "carelessly or inefficaciously," or even "imcompeten[tly]. *Comstock*, 273 F.3d at 703. But, that would establish merely that Edelman committed medical negligence, which does not rise to the level of "deliberate indifference" required to prevail on his Eighth Amendment claim. *Id.*; *see also, e.g. Titlow v. Correctional Med. Servs. Inc.*, 507 Fed. Appx. 579, 585 (6th Cir. 2012) (Committee's decision to deny surgical consult not deliberate indifference where an alternative treatment plan was proposed. Proposal of alternative plan showed lack of "deliberateness tantamount to an intent to punish."); *Bruce v. Correctional Med. Servs. Inc.*, No. 06-33, 2012 U.S. Dist. LEXIS 136225

(E.D. Tenn. Sept. 24, 2012) (finding that decision by doctor to delay surgery "traditionally fall[s] within the scope of a physician's medical judgment and [is], therefore not actionable under the Eighth Amendment absent a showing of obviousness.").[4]

That *Edelman* overrode a treating physician's surgery consult request does not change the analysis. A difference of opinion between a prisoner and prison medical staff, or even between various doctors involved in a prisoner's medical care regarding the treatment and diagnosis of a medical condition does not constitute deliberate indifference. *Johnson v. Stephan*, 6 F.3d 691 (10th Cir. 1993); *see also Yowell v. Vindhya*, No. 13-10029, 2013 U.S. Dist. LEXIS 115608, at *16 (E.D. Mich. July 24, 2013) ("Just as a plaintiff's disagreement with a prison doctor's chosen course of treatment does not establish deliberate indifference, a difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs.") (internal quotations and citations omitted); *Chapman v. Parke*, No. 91-5841, 1991 U.S. App. LEXIS 24359, at *4 (6th Cir. Oct. 4, 1991) (difference of opinion between prisoner and doctor, even where various treating physicians also differed in their opinions of condition, was not sufficient to raise a claim of deliberate indifference). Even if the medical personnel's opinion is inaccurate and treatment is unsuccessful, mere negligence or allegedly poor medical judgment does not constitute cruel and unusual punishment. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) ("The negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation. So long as a

---

[4] Moreover, even Colwell's own articles note differences of opinion on the issue of symptoms associated with these various conditions as well as whether and when a provider will notice elevated blood levels. [*See generally* P.E. ## 68-87; 114; 115]

medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met."). Thus, the Court's "subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id.*

Here, the uncontroverted evidence is that Edelman subjectively believed that the indicia of elevated blood levels and vital signs were necessary before surgery should be considered, and that prior to surgery, the condition could be treated conservatively with analgesics and diet modification. This evidence is supported by the averments of Dr. Steven Bergman, one of the consulting physicians, who concurs that Edelman's recommendations were reasonable. [64-6 ¶5; 64-5 at 6]. The fact that another doctor or doctors might disagree with Edelman's conclusions on these facts is, at best, grounds for a medical malpractice claim, as "federal courts are generally reluctant to second guess the medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). And, as explained above, such claims are not cognizable under the Eighth Amendment. *Comstock*, 273 F.3d at 703.

Colwell further argues that the fact that he was never actually treated with analgesics, and that his diet did not ultimately require modification, renders Edelman's recommendations for conservative treatment so woefully inadequate as to amount to "no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). The general proposition Colwell cites is correct; deliberate indifference may be proven "by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *Id.* However, courts generally find medical treatment to be akin to no treatment at all only where it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

23

intolerable to fundamental fairness." *Id.* at 843-44, *citing Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). Here, there is no material dispute of fact that Edelman's conduct does not rise to that level. Edelman's recommendation for diet modification was followed up by the nutritionist on staff and, although it was determined that Colwell's diet was adequate for his needs and that no special diet existed for him, the nutritionist continued to recommend he stay away from fatty or fried foods. (Colwell 73; 80). Further, Edelman was not the prescribing doctor in this factual scenario. There is no evidence to show that, after Edelman's first denial, Colwell sought analgesic medication to combat his pain, that it was ineffective in doing so, or that any other doctor ever believed that analgesics were not appropriate for his condition and therefore refused to provide them for him. Indeed, at the time of Edelman's third denial, the physician assistant attempted to secure a shot of Toradol for Colwell's pain, and ultimately gave him two samples of Motrin when Toradol was not available. *Id.* at 103. Even if Colwell could show that doctors refused to provide these medications on other occasions, this might constitute evidence that *those doctors* were deliberately indifferent to Colwell's medical needs, but it would not be evidence that *Edelman* acted with deliberate indifference.

Ultimately, Colwell "presents a classic claim of medical malpractice as an allegation of deliberate indifference to serious medical need." *Humphries v. Smith*, 9 Fed. Appx. 304, 308 (6th Cir. 2001). Edelman "assessed [Colwell's] condition, made a reasonable diagnosis, and provided a treatment." *Id.* At most, Colwell's allegations related to the first surgery consult denial describe "an inadvertent failure to provide adequate medical care which does not constitute deliberate indifference to serious medical needs." *Id.*

### b.   *Denial of GI Consultation*

The same analysis applies to Edelman's denial of a GI Consultation, and shows his

24

conduct did not rise to the level of deliberate indifference.  At the time of this denial, Colwell's exam again revealed normal vital signs, tenderness in his upper abdomen, but no guarding or rebound, and an absence of lab work showing increased GGT or alkaline phosphate levels. (Colwell 91; 93-94).  Edelman denied the request for a GI consultation, noting that these same indicia were absent, and recommended symptomatic treatment and for Dr. McGuire to follow up with Dr. Jenkins as needed.  *Id.* at 91.  While Dr. McGuire did note at the time that Colwell had failed his outpatient therapy of "changing diet to decrease fat," this alone was not the extent of the conservative treatment regimen suggested by Edelman's initial denial, as the uncontroverted evidence shows that a recommendation for conservative treatment implicitly includes treatment with analgesics, [64-2 ¶8], and there is no evidence analgesics were offered to or requested by Colwell at this juncture to symptomatically treat his pain.  For the same reasons discussed above, the Court finds that Edelman's conduct during this denial constitutes, at most, medical malpractice which does not rise to the level of deliberate indifference.

### c.    *Denial of Follow-Up Ultrasound*

Edelman's third denial is a closer call.  Edelman denied Dr. Shepherd's request for a follow-up ultrasound on the basis that Colwell's elevated bilirubin level was "likely due to Gilbert's disease," that there were no other elevated blood levels associated with his episodes, and that there were no vital signs "consistent with distress."  (Colwell 107).  However, the evidence shows that Colwell at the time did exhibit some objective manifestations of complications that Edelman avers were necessary to warrant more aggressive treatment of his condition, including a fever, distress, and guarding upon palpation.  *Id.* at 101; 103.[5]  Second,

---

[5] At the same time, the Court notes that, although Colwell described his pain to PA Campbell as "sharp/stabbing," he also indicated that it followed a "waxing/waning course, lasting minutes before resolving on its own."  (Colwell 102).  This is certainly consistent with a finding that

Edelman never explained (neither in his denial nor in his affidavit) upon what basis he concluded that Colwell's elevated bilirubin level was associated with Gilbert's disease, which is a genetic disorder. Edelman himself avers that an elevated bilirubin level can have many causes, [64-2 ¶ 5], and thus it is unclear why he attributed Colwell's increased bilirubin level to a benign genetic disorder of which there is no evidence in the record to suggest that Colwell possesses.

However, Edelman's decision was also fueled by his concern that the request had been made prior to receiving lab results that could confirm or deny the presence of complications related to gallstones, namely the elevated GGT and alkaline phosphate levels. *Id.* ¶ 5; Colwell 107. He specifically noted that a person for whom a bilirubin level was associated with gallstones and bile duct obstruction, would not experience such a bump absent heightened GGT and alkaline phosphate levels. *Id.* This had been Edelman's consistent medical opinion throughout his denials of service, and he avers that it continued to be his medical opinion at the time based on his knowledge of the condition. [64-2 ¶¶5, 40].

Again, whether Edelman's opinion is medically correct or not does not create a genuine issue of material fact as to whether he was deliberately indifferent in his decision-making. Edelman has offered uncontroverted testimony that he genuinely believed that the sum of Colwell's symptoms, and especially the lack of increased GGT and alkaline phosphate levels, demonstrated that Colwell's condition could be conservatively treated by analgesics and diet modification. Those averments have been supported by the testimony of Dr. Bergman and, on at least two occasions when faced with similar or arguably even more severe symptoms, Colwell's treating doctors also took a wait-and-see position in relation to his condition. [64-6; Colwell 87, 96, 132].

---

Colwell was not in prolonged acute distress.

26

Colwell has offered no admissible evidence show that Edelman's denial was anything other than the "product of considered medical judgment." *Cobbs v. Pramstaller*, 475 Fed. Appx. 575, 583 (6th Cir. 2012). While, given his post-operative diagnosis, Colwell's need for surgery may seem evident in hindsight, (Colwell 164-65), that cannot factor into the Court's analysis of Edelman's earlier denial of an ultrasound. Rather, the Court's focus must be on whether, *at the time Edelman denied the ultrasound*, he acted with deliberate indifference to Colwell's serious medical needs. *See e.g. Cobbs*, 475 Fed. Appx. at 582-83 (holding that doctors' decision to monitor inmate's condition rather than approve surgery based on medical knowledge at the time did not rise to the level of deliberate indifference). Based on the foregoing, Colwell has failed to raise a material question of fact that Edelman's conduct rose to anything more than (at most) careless, inefficacious, or incompetent medical treatment, none of which constitutes deliberate indifference under the Eighth Amendment. *Comstock*, 273 F.3d at 703.

For these reasons, Edelman's motion for summary judgment against Edelman should be granted.

### 2.    *Defendant Hallworth*

Colwell asserts that Defendant Hallworth violated his Eighth Amendment rights by receiving the letter from Colwell's fiancée, and failing to act upon it. In order to demonstrate liability under §1983, a plaintiff must first establish that each named defendant acted under color of state law and that her actions violated rights secured by the Constitution and/or laws of the United States. *See Baker v. McCollan*, 443 U.S. 137 (1989). The plaintiff also must make a clear showing that each named defendant was personally involved in the activity that forms the basis of the complaint. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Moreover, § 1983 liability cannot be premised upon mere

allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a defendant can only be liable under § 1983 if the plaintiff shows that she personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421. A supervisory official's awareness of a complaint of allegedly illegal conduct, and her subsequent failure to take corrective action, is insufficient to trigger § 1983 liability. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). Rather, liability under § 1983 must be based upon active unconstitutional behavior, not a "mere failure to act." *Shehee*, 199 F.3d at 300. Under these legal standards, it is clear that defendant Hallworth is entitled to summary judgment.

First, the uncontroverted evidence shows that defendant Hallworth did not personally receive Colwell's fiancée's letter. Briana Anderson, an associate patient safety officer with Corizon, filed a sworn affidavit explaining the process used to deal with letters directed to Hallworth. [64-4 at 2-5]. She noted that such letters first go to the compliance department, are logged and then sent to the appropriate reviewers. [*Id.* at ¶ 3]. She averred that letters that are sent to and personally seen by Hallworth, bear the indicia of such review by placement of his initials on the letter. [*Id.* at ¶¶ 4-5]. Ms. Anderson retrieved the letter sent by Colwell's fiancée from the files and noted that Mr. Hallworth's initials are not on it, indicating he did not personally review the letter. [*Id.*].

In response, Colwell argues that this is not enough to show that Hallworth did not review the letter, and that Colwell is willing to dismiss his claim against Hallworth upon the filing of Hallworth's own affidavit attesting that he never saw the letter. However, having provided Anderson's affidavit containing competent evidence sufficient to demonstrate the absence of a genuine dispute of material fact as to whether Hallworth reviewed the letter, *Celotex*, 477 U.S. at

325, "'the burden shifts to [Colwell] to set forth specific facts showing a triable issue.'" *Wrench*, 256 F.3d at 453 (quoting *Matsushita*, 475 U.S. at 587.  Colwell cannot satisfy his burden by simply asking for more or different evidence from Hallworth.  *Alexander*, 576 F.3d at 558.  *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (holding that a plaintiff may not rest on his allegations at the summary judgment level, but must present "significant probative evidence" establishing that "there is a genuine issue for trial").

As a result, the Court finds that there is no genuine dispute of fact that Hallworth had no personal involvement in Colwell's case, and thus he cannot be found liable under Section 1983 for an Eighth Amendment violation related to Colwell's medical care.

### 3.   *Defendant Corizon*

Finally, Colwell argues that Corizon violated his Eighth Amendment rights by having a policy and procedure in place to encourage its employees to effectuate the lowest possible standard of care in order to save money.  Colwell does not put forth any evidence to support his claim, other than citing decisions from other cases as well as two pages from Corizon's contract with MDOC.

As noted, above, claim for a § 1983 violation cannot be premised upon the theory of *respondeat superior*.  *Monell*, 436 U.S. at 690.  In the case of a corporation, such as Corizon, "[i]t is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983."  *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (internal quotation marks omitted).  A custom is a practice "that has not been formally approved by an appropriate decisionmaker," but is "so widespread as to have the force of law."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137

L. Ed. 2d 626 (1997).  Moreover, the policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983." *Searcy*, 38 F.3d at 286 (internal quotation marks omitted).

A private entity which contracts with the state to perform a traditional state function like providing healthcare to inmates, like Corizon, can "be sued under § 1983 as one acting 'under color of state law.'" *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (quoting *West v. Atkins*, 487 U.S. 42, 54, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)).  The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983.  *See Starcher v. Corr. Med. Sys., Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell* has been extended to private corporations); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996) (same); *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (same); *Cox v. Jackson*, 579 F. Supp. 2d 831, 851-52 (E.D. Mich. 2008) (same).

Here, the Court has found that Colwell's claims of deliberate indifference fail against the named individual defendants Edelman and Hallworth.  However, even assuming Colwell could support his claim of a constitutional violation by some other unnamed Corizon employee, he is unable to show that the decisions to deny surgery, a GI consultation and a follow-up ultrasound were based on a policy, custom or practice of Corizon.

He asserts that the decisions to deny these specific treatments were based on financial considerations.  In support of his argument, he cites three cases, from other jurisdictions from the years between 1985 and 2006, to show that Corizon (formerly Prison Health Services) engaged in a pattern of abuse in the name of cost-savings.[6]  He further points to Corizon's contract with

---

[6] Colwell cites *Ancata v. PHS*, 769 F.2d 700 (11th Cir. 1985); *McCabe v. PHS*, 117 F. Supp. 2d

the MDOC, (P.E. 107), which provides a pool of money within which Corizon is to operate, and asks this Court to infer that because there is a finite amount of money set aside to pay Corizon, its decisions on the care of inmates is driven solely by its motivation to keep the most of that money in its own corporate pocket, rather than spending it on inmate care.   However, the existence of a contract between MDOC and Corizon that limits the amount of money Corizon receives over a set period of time alone does not raise a reasonable inference that *Colwell's* care was motivated solely or primarily by profitability or that Corizon has any sort of explicit or implicit policy to deny necessary or appropriate treatment on the basis of cost.   Moreover, no evidence of record supports Colwell's claims that his medical treatment was the product of anything other than considered medical judgment.   While the Court is mindful of its obligation to draw all reasonable inferences in favor of Colwell at this juncture, this inference is not

---

443 (E.D. Pa. 1997); and *Williams v. PHS*, 167 Fed. Appx. 555 (7th Cir. 2006), all of which, besides being of no precedential value in this jurisdiction, are factually distinguishable from this case, and fail to support a claim for a pattern or practice of substandard care in the name of cost savings that can be imputed to Corizon's behavior in this case.   In each of those cases, the plaintiff survived a motion to dismiss, and in one instance a motion for summary judgment, premised upon the defendant doctors' clear and undisputed knowledge of the severity of the prisoner's condition, and either outright refusal to treat the prisoner, or provision of treatment so inadequate as to amount to no treatment at all.   *See Ancata*, 769 F.2d at 704 (defendant doctors could be inferred to be deliberately indifferent where they placed burden on prisoner to obtain court order or pay for treatment they, themselves were aware was necessary, and thus corporate entity could also be liable); *McCabe*, 117 F. Supp. 2d at 446-47 (deliberate indifference a triable issue against certain doctors whose reasons for not evaluating prisoner for surgery were solely based on lack of receipt of prior records, not on any objective medical diagnosis or opinion about treatment); *Williams*, 167 Fed. Appx. at 558-59 (allowing claims against PHS to survive motion to dismiss where plaintiff alleged that PHS classified hernia surgery as elective as a way to deny surgery to inmates).   None of these cases actually found the doctors liable for deliberate indifference, let alone proved that there was a policy or procedure commanding or influencing the doctors' decision.   Indeed, in the two cases that allowed claims to go forward against the corporate entity, the motions at issue were ones to dismiss based on the pleadings alone, which were scrutinized under a far more lenient standard than the one Colwell faces at the summary judgment stage here, which requires him to produce sufficient admissible evidence to create a triable issue of fact.   *Ancata*, 769 F.2d at 702-06; *Williams* 167 Fed. Appx. 557-59; *Wrench*, 256 F.3d at 453.   Finally, in *McCabe*, which was decided on summary judgment, the corporation was actually dismissed as a defendant.   117 F. Supp. 2d at 445 fn. 1

reasonable on the factual record before the Court.

Colwell further argues that the contract's managed care model, which he claims is based on the HMO model, while "technically legal when corporations deny needed healthcare to the general public . . . ha[s] no place in the penal system, as prisoners have the Constitutional right to healthcare where the general public does not."  (Resp. at 21).  However, even if Colwell's characterization of Corizon's "model" is accurate, his argument is flawed.  The law is clear that prisoners "do not have a constitutional right to limitless health care, free of cost constraints under which law abiding citizens receive treatment."  *Winslow v. Prison Health Servs., Inc.*, 406 Fed. Appx. 671, 673 (3d Cir. 2011) (citing *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.").  Therefore, Colwell's argument that Corizon's alleged policy of managed healthcare violates a prisoner's Eighth Amendment rights must be rejected.

Colwell further argues that Corizon's alleged policy of permitting the substitution of a general practitioner's judgment for that of a specialist, and its policy of inadequate staffing (its lack of specialists on staff) contribute to the failure of Corizon to provide adequate healthcare to inmates, and is the result of Corizon's unwillingness to compromise its bottom line for the sake of inmates' health and safety.  However, Colwell cites no evidence to support these last two arguments, and a plaintiff may not rest on his allegations at the summary judgment level, but must present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack*, 434 F.3d at 814.  *See also Yowell*, 2013 U.S. Dist. LEXIS 115608, at *16 ("a difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs.").

As Colwell has not sustained his burden of providing more than a "scintilla of evidence" to show that Corizon was deliberately indifferent to his serious medical needs as the result of a policy, practice or custom, Corizon's motion for summary judgment should be granted. *Anderson*, 477 U.S. at 251.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS granting Defendants Corizon, Edelman and Hallworth's motion for summary judgment [64] and DISMISSING Colwell's claims WITH PREJUDICE.

Dated: August 11, 2014                          s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.   A party may respond to another party's objections within 14 days after being served with a copy.

*See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager