UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DICKIE COLWELL,

    Plaintiff,

v.

CORIZON HEALTHCARE INC., et al.,

    Defendants.
    _____/

Case No. 11-cv-15586

HONORABLE STEPHEN J. MURPHY, III

**ORDER ADOPTING THE REPORT AND
RECOMMENDATION** (document no. 82) **AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** (document no. 64)

    Plaintiff Dickie Colwell is a prisoner at the G. Robert Cotton Correctional Facility ("Cotton Facility"). Colwell filed suit under 42 U.S.C. § 1983 against health care providers at the Cotton Facility, claiming they were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. The defendants filed a motion for summary judgment. Mot. Summ. J., ECF No. 64. The Court referred the motion to a United States magistrate judge, who issued a Report and Recommendation ("Report") advising the Court to dismiss the case. Report, ECF No. 82. Colwell filed eight timely objections. Objection, ECF No. 87.

## BACKGROUND

    The Report contains a thorough and accurate description of Colwell's medical and treatment history, none of which Colwell disputes. Accordingly, the Court will adopt the Report's statement of facts. A brief summary of pertinent events, however, will help better frame the issues.

    The gallbladder is an organ located near the liver. Mot. Summ. J., Edelman Aff. ¶ 4, ECF No. 64-2. It stores bile, a fluid made by the liver to help absorb fat. *Id.* When the bile

coagulates, it turns into gallstones. *Id.* A person may suffer from gallstones for years without any symptoms or pain. *Id.* The stones become problematic, however, when they obstruct the bile ducts connecting the gallbladder and liver to the small intestine. When a gallstone temporarily obstructs the bile duct, it causes biliary colic, a condition producing nausea and intermittent intense pain. *Id.* Biliary colic, while painful, is not otherwise dangerous, and may be treated through a low-fat diet and pain killers. *Id.* When a gallstone permanently blocks the bile duct, the complications become severe. *Id.* The obstructed bile duct causes fluid to build up, inflaming the gallbladder. Unlike a temporary obstruction, this condition is continuously painful and can be very dangerous. *Id.* One way to treat an inflamed gallbladder is to have surgery to remove it. *Id.,* Bergman Aff. ¶ 6, ECF No. 64-6.

While in prison, doctors diagnosed and treated Colwell for HIV and Hepatitis C. The physicians prescribed Reyataz—a medication that has side effects on the gallbladder and liver—to treat Colwell's HIV. *Id.,* Edelman Aff. ¶ 66, ECF No. 64-2. In 2006, an ultrasound disclosed gallstones forming in Colwell's gallbladder. Through 2009 his gallstones were asymptomatic. Beginning in 2010, Colwell noticed a tender lump in his abdomen. Health Rec. 44, ECF No. 66-1. Colwell was particularly concerned about the lump because his mother had been diagnosed with Cholangiocarcinoma, a rare form of cancer originating in the gallbladder and liver. *Id.* In October of 2010, an ultrasound revealed multiple gallstones, but no gallbladder wall thickening, pericholecystic fluid build up, or bile duct dilation. *Id.* at 8, ECF No. 66-2.

At the start of 2011, Colwell began complaining of pain radiating through his back and shoulders. *Id.* at 20. He also felt nauseated, and reported vomiting. *Id.* at 15. Colwell's treating physician, Dr. McGuire, made a request for a surgical consult, noting that Colwell's

2

gallstones had become symptomatic. *Id.* at 18. Defendant Edelman denied the request, stating Colwell's symptoms were only "indicative of biliary colic," and did not require surgery. Mot. Summ. J., Edelman Aff. ¶ 5, ECF No. 64-2. He noted that Colwell's elevated biluribin levels (an indicator of gallbladder inflammation) were likely caused by the HIV medication, or a genetic disorder called Gilbert's Disease. *Id.* Furthermore, Colwell did not have elevated levels of GGT and alkaline phosphatase—other indicators of gallbladder inflammation. Health Rec. 23, ECF No. 66-2. Nor did the 2010 ultrasound indicate that Colwell's galbladder was inflamed. Mot. Summ. J., Edelman Aff. ¶ 6, ECF No. 64-2. Finally, Colwell's vital signs, such as his heart rate and blood pressure, were not elevated, as would be expected if Colwell was in severe pain. *Id.* ¶ 7. Thus, Edelman recommended treating Colwell through a low-fat diet and pain killers. The parties dispute whether Edelman's decision to cancel the surgical consult evinced a deliberate indifference to Colwell's health.

Over the next few months, diet and pain killers did not alleviate Colwell's pain. By March, Colwell complained of frequent diarrhea, bloating, and hot flashes. Health Rec. 42, ECF No. 66-2. He also had stabbing pain under his ribs and constant pain radiating through his right shoulder. *Id.* His vital signs were still within normal ranges, and his lab results still showed normal levels of GGT and alkaline phosphatase. *Id.* Dr. McGuire noted that diet and pain killers had "[f]ailed" as treatment, and requested a gastroenterological consultation. *Id.* Once more, Edelman denied the request, stating: "Not clear why we would need GI consultation. No lab or vital sign abnormalities associated with these episodes. Follow on site, treat symptomatically." *Id.* at 47. Colwell contends that Edelman's denial of the gastroenterological consultation showed he was deliberately indifferent.

3

In April, Nurse Haase and Physician Assistant Campbell evaluated Colwell. Both noted his condition was getting worse. Haase wrote that Colwell presented with "[n]ausea, pain under R rib cage radiats to back and R shoulder blade, low grade fever, sweats at night," as well as belching and frequent diarrhea. *Id.* at 2, ECF No. 66-3. And she stated that his skin and eyes were turning yellow. *Id.* She noted that his pain was "sharp/stabbing, with waxing/waning course, lasting minutes before resolving on own." *Id.* at 3. Furthermore, he presented with signs of anxiety and depression as a result of the lack of treatment, particularly because he worried the lump in his abdomen was cancerous. PA Campbell requested an ultrasound of the "gallbladder to evaluate for fluid collection, wall thickening or obstruction." *Id.* at 5. Again, Edelman rejected the request. *Id.* at 8. He explained that elevated bilirubin levels were likely a result of Gilbert's Disease (though he has not provided any evidence Colwell suffered from this disease). *Id.* The lab tests had not revealed elevated alkaline phosphatase or GGT levels. *Id.* And Colwell's vital signs were within the normal range. *Id.* Colwell argues that Edelman's rejection of his request for an ultrasound violated his Eighth Amendment rights. This was Edelman's last direct involvement in Colwell's care.

In November of 2011, Colwell was still on a low fat diet and taking pain-killers, but had not yet had a consultation with a surgeon. His fiancé wrote a letter outlining Colwell's symptoms and treatment to defendant Hallworth, the CEO of Corizon. Mot. Summ. J., Mason Aff. 8, ECF No. 64-5. She also sent a copy of the letter to Karen Mason, Corizon's director of quality improvement. *Id.* ¶ 3. On December 27, 2011, Colwell underwent a surgical consultation with Dr. Prough, who recommended surgery to remove the gallbladder. Health Rec. 4, ECF No. 66-4. On February 10, 2012, physicians performed a

4

laparoscopic cholecystectomy on Colwell. *Id.* at 8. Surgery revealed Colwell's gallbladder was tense and inflamed and full of "white bile," findings consistent with an inflamed gallbladder. *Id.* at 15–16. The surgery was successful, and resolved Colwell's symptoms. *Id.* at 14.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The Court must take care, in evaluating the motion, not to make judgments on the quality of the evidence, because the purpose of summary judgment is to determine whether a triable claim exists. *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

**DISCUSSION**

Colwell brings eight objections to the magistrate's Report advising the Court to dismiss the case. The objections can be grouped roughly into four categories. First, he argues the magistrate erred in determining that Edelman was not deliberately indifferent to an excessive risk to Colwell's safety (objections 1, 2, 3, 4 and 5). Second, Colwell objects to the magistrate's recommendation that the Court dismiss Hallworth (objection 6). Next, he contends the magistrate incorrectly found Corizon did not have a policy of constitutional rights violations (objection 7). Finally, Colwell argues the Court should appoint counsel (objection 8). The Court will address each set of objections in turn.

I. <u>Edelman Did Not Violate Colwell's Eighth Amendment Rights</u>

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Amendment "forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (internal quotation marks omitted). To show that a prison official acted with deliberate indifference, the prisoner must suffer from a "sufficiently serious" medical condition. *Id.* Furthermore, the prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896. The standard is satisfied when a prisoner "alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Scott v. Ambani,* 577 F.3d 642, 648 (6th Cir. 2009) (citations omitted); *see also Blackmore,* 390

F.3d at 899 ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.").

In evaluating an Eighth Amendment claim, courts "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted). When a prisoner claims his care was inadequate, "federal courts are generally reluctant to second guess medical judgments." *Id.* There are a narrow range of cases, however, when the medical treatment is "so woefully inadequate as to amount to no treatment at all." *Id.*

In the present case, there is no doubt an inflamed gallbladder is a serious condition. The only question is whether Edelman knew Colwell suffered from an inflamed gallbladder or blocked bile duct, and failed to render adequate treatment. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446–47 (6th Cir. 2014). If there are plausible reasons why Edelman thought Colwell suffered from biliary colic, as opposed to an inflamed gallbladder, the Court must dismiss the case, even if the Court otherwise believes Edelman rendered a substandard level of care.

A. The Denial Of Surgical Consultation

Edelman has provided a plausible explanation for why he thought Colwell exhibited signs of biliary colic and not gallbladder inflammation. At the time of the surgical consultation request, Colwell's blood work was inconsistent with gallbladder inflammation. Colwell did not have elevated levels of GGT or alkaline phosphatase, two indicators that a gallstone had fully blocked his bile duct. Health Rec. 23, ECF No. 66-2. His bilirubin level

7

was not high enough to indicate an inflamed gallbladder. And Edelman stated the high bilirubin levels were more easily explained as a side effect of the HIV medication or a symptom of Gilbert's disease. Mot. Summ. J., Edelman Aff. ¶ 5, ECF No. 64-2.

In addition, Colwell recently had an ultrasound of the gallbladder. The ultrasound "ruled out gallbladder wall thickening, pericholecystic fluid, or bile duct dilation," all signs of an obstruction of the bile duct. *Id.* ¶ 6. Nor did he have involuntary indicia of pain, such as an elevated heart rate or blood pressure. *Id.* ¶ 7. Based on those factors, the Court cannot second guess Edelman's initial determination that Colwell suffered from biliary colic, but not a blocked bile duct.

Furthermore, Edelman was not deliberately indifferent by recommending treatment with painkillers and diet changes, not surgery. The Sixth Circuit recently held that a prison physician did not violate a prisoner's Eighth Amendment rights when he recommended conservative treatment instead of a surgical consultation. *Titlow v. Corr. Med. Servs., Inc.*, 507 F. App'x 579, 585 (6th Cir. 2012). The court reasoned that the physician's recommendation of "a specific alternative treatment plan" and his desire to gather more information before proceeding to surgery plausibly explained his denial of a surgical consultation. *Id.*

In the present case, Colwell first reported pain in his abdomen on January 4, 2011. Dr. McGuire requested a surgical consult a week later. Health Rec. 18, ECF No. 66-2. In denying the request, Edelman provided a specific alternative treatment plan—Colwell should eat less fat and take painkillers. *Id.* at 23. Dr. Bergman, one of the doctors that recommended Colwell undergo surgery in 2012, filed an affidavit stating gallstones can be "managed effectively through conservative treatment such as diet modification and

analgesic medication." Mot. Summ. J., Bergman Aff. ¶ 4, ECF No. 64-6. Furthermore, Colwell has Hepatitis C, HIV, and is on many different medicines. Edelman was justified in trying to avoid invasive surgery—which would require anesthesia and come with its own set of risks, especially for someone with so many other health problems.[1] Accordingly, the Court agrees with the magistrate that the initial denial of a surgical consult did not deny Colwell his Eighth Amendment rights.

    B.  <u>Denial Of Gastroenterological Consultation</u>

Colwell next argues Edelman violated his constitutional rights by denying his request for a gastroenterological consultation. By the end of March, Colwell had been on a low-fat diet and taking aspirin for two months. Yet, Colwell claimed his condition was deteriorating. He complained of constant stabbing pain in his upper right quadrant, consistent with what Edelman described as a symptom of gallbladder inflammation. Health Rec. 42, ECF No. 66-2. He also claimed to have frequent diarrhea, bloating, and night sweats. *Id.* His treating physician, Dr. McGuire, noted that conservative treatment had failed, and requested a gastroenterological consultant. *Id.*

Edelman again denied the request. He stated: "Not clear why we would need GI consultation. No lab or vital sign abnormalities associated with these episodes. Follow on site, treat symptomatically." *Id.* at 47, ECF No. 66-2. Consistent with Edelman's statements, the objective evidence in Colwell's file documented a low heart rate, normal blood pressure, no fever, and an absence of lab work showing high GGT or alkaline phosphate levels.

---

[1] Prior to undergoing surgery, physicians counseled Colwell on the extensive risks and complications that could arise during the procedure. Health Rec. 18, ECF No. 66-4.

9

Thus, the objective evidence was inconsistent with Colwell's description of his symptoms, and supported a determination Colwell suffered from biliary colic.

Furthermore, Edelman was not deliberately indifferent to Colwell's health by requiring him to continue with conservative treatment. For example, in *Titlow,* a woman suffered from breast pain. 507 F. App'x at 581. Her physician requested a surgical consultation that an advisor denied. *Id.* at 582. Instead, the doctor recommended she stop taking certain hormonal drugs linked to breast sensitivity. *Id.* Although she ceased taking the medication, her breast pain continued. Over the next three years, her pain continued unabated, even though she no longer took the hormonal drugs. On four separate occasions, her doctors requested surgical consultations; the advisor denied each request. In January of 2008, a doctor appealed one of the denials to a review committee. The committee denied the surgical consultation request without explanation. *Id.*

The Sixth Circuit held that the 2008 denial violated her Eighth Amendment rights. It noted that after three years of ineffective treatment, it was clear "that more conservative treatment options failed." *Id.* at 586. Moreover, extensive treatment records gathered between 2005 and 2008 provided doctors with all the information they would need to make a fully informed determination. *Id.* Finally, the review committee did not provide any justification for its denial, thus making it less likely the denial had a medical rationale. *Id.*

In this case, Edelman's denial of a GI consult was plausibly based on medical judgment. Unlike in *Titlow,* Colwell had only been undergoing conservative treatment for two months, not three years. The Court cannot second-guess Edelman's determination that

10

two months is not a long enough trial period for a course of treatment.[2] Admittedly, Dr. McGuire believed conservative treatment had failed as a treatment option. Health Rec. 42, ECF No. 66-2. But the difference in opinion between Dr. McGuire and Edelman is outside of the Court's competence, and is not so egregious or obvious as to be a constitutional violation. Accordingly, Edelman reasonably believed Colwell suffered from biliary colic, and his decision to continue with conservative treatment was plausibly based on medical judgment.

    C.    Denial Of Ultrasound

Three weeks after requesting a GI consult, Colwell's condition continued to deteriorate. On April 14, 2011, he had an appointment with RN Haase. He reported nausea, pain under his rib cage that radiated through his back and shoulder, a fever, night sweats, and belching. *Id.* at 2, ECF No. 66-3. Throughout each day, he would have multiple episodes of diarrhea. *Id.* And RN Haase noted that his skin and eyes were turning yellow. *Id.* Furthermore, his bilirubin levels had spiked significantly over the past month. *Id.* at 5. After reviewing the symptoms, PA Campbell requested an updated gallbladder ultrasound to "evaluate for fluid collection, wall thickening or obstruction." *Id.*

Edelman denied the requested ultrasound. *Id.* at 8. He explained that Colwell's vital signs and lab work were not consistent with an obstructed bile duct or gallbladder inflammation. In support he noted there were more likely explanations for the bilirubin spike, such as Gilbert's disease or the HIV medication. *Id.*; Mot. Summ. J., Edelman Aff. ¶ 5, ECF

---

[2]The magistrate's Report suggests Colwell may not have followed the conservative treatment plan, as "there is no evidence analgesics were offered to or requested by Colwell at this juncture to symptomatically treat his pain." Report 25, ECF No. 82. The Court notes that every medical report from the relevant time period states Colwell was taking aspirin, an analgesic pain killer. *See* Health Rec. 37, 42, 44, 46, ECF No. 66-2.

11

No. 64-2. Furthermore, his GGT and alkaline phosphate levels were not elevated, which Edelman consistently stated would accompany a blocked bile duct. Health Rec. 8, ECF No. 66-3. Finally, he noted that other vital signs were inconsistent with distress. *Id.* PA Campbell described Colwell as having "no acute distress," and Colwell's pulse, breathing and blood pressure were all within normal limits. *Id.* at 3.

To be sure, other criteria indicated a blockage. Colwell complained of pain radiating through his back and right shoulder. *Id.* at 2. And he had a low grade fever and guarding, both of which Edelman stated were objective indicators of an inflamed gallbladder. *Id.* Moreover, unlike surgery, merely getting another ultrasound is not invasive or risky. And the request appears reasonable because it had been nearly six months since the last ultrasound. Nonetheless, because Edelman still believed Colwell suffered from biliary colic, not an inflamed gallbladder, the Court must grant defendant's motion for summary judgment. *See Rouster,* 749 F.3d at 451–52 (holding that prison official was not deliberately indifferent, even though he incorrectly diagnosed prisoner with alcohol withdrawal, when some of the symptoms were inconsistent with withdrawal).

D. Edelman Did Not Ignore An Excessive Risk Of Colwell Developing Cancer

Colwell contends that he was at serious risk for Cholangiocarcinoma, because he is Native American (an ethnic group susceptible to this type of cancer), his mother had recently died from cancer, and because chronic liver disease, such as Hepatitis C, can increase the risk of developing cancer. Objection 7–8, ECF No. 87. By not testing for the cancer, Colwell argues, Edelman put him at excessive risk of death or serious injury.

Edelman has provided a plausible explanation, however, for his decisions and explained why he did not think Colwell was likely to develop cancer. In his affidavit,

12

Edelman stated that "Cholangiocarcinoma is not hereditary." Mot. Summ. J., Edelman Aff. ¶ 39, ECF No. 64-2. Furthermore, while Edelman acknowledged that Hepatitis C can increase the risk of Cholangiocarcinoma, "there was no indication in the [2010] ultrasound that the patient was at risk." *Id.* And Dr. Hutchinson, an infectious disease specialist (though not, apparently, a cancer specialist) was watching Colwell for complications arising from his HIV and Hepatitis C treatment. *Id.* Finally Dr. Bergman stated in an affidavit that absent inflammation of the gallbladder, "there was a vanishingly small risk that the patient's [gallstones] would cause cancer of any kind." *Id.,* Bergman Aff. ¶ 5, ECF No. 64-6. While Colwell has provided some evidence he was at heightened risk of developing cancer, Edelman provided a plausible medical explanation for his actions.

     E.    Colwell's Attached Wikipedia And Medscape Articles Do Not Change The Court's Conclusion

Colwell attempted to introduce multiple Wikipedia and Medscape articles as evidence supporting his brief. The magistrate recommended the Court find the articles inadmissible as hearsay. In the alternative, the magistrate stated the information in the articles does not change the outcome of the case. The Court agrees with the magistrate, for the reasons articulated in the Report, that the articles are inadmissible. Even if the articles were admissible evidence, however, they would not change the Court's conclusion.

The information in the articles is generally consistent with Edelman's affidavit. According to Colwell's articles, the primary cause of gallstones "is from a high fat, high cholesterol diet." Resp. 97, ECF No. 73. And one initial treatment option is to consume less fat. *Id.* at 95–96. This treatment option was consistent with Edelman's actions.

Furthermore, the articles state that when a gallstone blocks a bile duct, thereby causing gallbladder inflammation, it "causes severe pain." *Id.* at 98. Yet, one reason

13

Edelman concluded Colwell did not have gallbladder inflammation was that his heart rate and blood pressure were inconsistent with a person in severe pain. In addition, the wikipedia article states that "elevated alkaline phosphatase" levels were an indication of an inflamed gallbladder, as were "gallbladder wall thickening . . . pericholecystic fluid, and gallbladder dilation." *Id.* at 3. As explained above, Colwell had normal levels of alkaline phosphatase, and a 2010 ultrasound showed no wall thickening, pericholecystic fluid, or gallbladder dilation.

Finally, the articles support Edelman's conclusion that Colwell was not excessively at risk for Cholangiocarcinoma. The wikipedia article states that, while Native Americans are an at risk group, the cancer predominately occurs in women in their 60s and 70s (such as Colwell's mother), not in men in their 40s. *Id.* at 19. Furthermore, the articles recite that elevated GGT and alkaline phosphatase levels indicate cancer. *Id.* at 7. And, "the presence of gallstones is not clearly associated with cholangiocarcinoma." *Id.*

The only time the articles clearly contradict Edelman's affidavit is when they state that patients with "chronic" gallbladder inflammation may have normal lab values and non-specific symptoms. *Id.* at 33. This assertion is inconsistent with Edelman's claims that high GGT and alkaline phosphatase levels are reliable indicators that a gallstone is obstructing a bile duct. The inconsistency is disconcerting because surgery showed Colwell suffered from chronic gallbladder inflammation and bile duct obstruction. That Colwell did a better job than his physicians in diagnosing his condition (using only evidence gleaned from Wikipedia, no less), is enough to give the Court pause. Nonetheless, although Edelman incorrectly diagnosed Colwell's symptoms, the law is clear that "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."

*Rouster,* 749 F.3d at 447 (6th Cir. 2014) (internal quotations omitted). Because the article are inadmissible and show only that Edelman incorrectly evaluated Colwell's condition, the Court must dismiss the claim.

II.  The Court Will Dismiss The Claims Against Hallworth

In November of 2011, Colwell's fiancé sent a letter to Corizon CEO Richard Hallworth. In the letter, she outlined Colwell's symptoms and his treatment to that date. Mot. Summ. J., Mason Aff. 8–9, ECF No. 64-5. Colwell argues the letter put Hallworth on notice that doctors were providing inadequate care, and that he failed to take corrective action. The magistrate recommended dismissing the claim because there is no evidence Hallworth ever received the letter. Report 28, ECF No. 82.

Briana Anderson, a patient safety officer at Corizon, has filed an affidavit stating that letters sent to Hallworth are directed to the compliance department for evaluation and response. Mot. Summ. J., Anderson Aff. ¶ 3, ECF No. 64-4. If Hallworth reviewed the letter, he would put his initials in the top corner. *Id.* ¶5. Because the letter required clinical review, she was the officer that received and evaluated the letter. *Id.* ¶ 3. According to her notes, she forwarded the letter to Dr. Orlebeke and Dr. McQueen, two regional medical officers. *Id.* ¶ 6. Furthermore, based on emails attached to the Karen Mason's affidavit, physicians had scheduled Colwell for surgery as early as December 19, 2011, though he did not receive the surgery until February of 2012. Mot. Summ. J., Mason Aff. 5, ECF No. 64-5.

For two reasons, the Court will grant Hallworth's motion for summary judgment because the is no genuine dispute of any material fact. First, there is no evidence that he ever saw the letter. Anderson's affidavit states that Hallworth would put his initials in the corner of letters that he read. Because Colwell's letter does not contain any initials, there

is no evidence that he saw the letter. Second, even if Colwell had seen the letter, the evidence would not show that he was deliberately indifferent. Indeed, by December 19, roughly a month after Colwell's fiancé mailed the letter, Colwell was scheduled for an operation to remove his gallbladder. If anything, the relatively prompt response to Colwell's letter shows that Corizon acted appropriately.[3]

### III.  The Court Will Dismiss The Claims Against Corizon

Colwell also brought 42 U.S.C. § 1983 claims against Corizon, arguing that it had a policy of rendering unconstitutionally poor treatment as a way to save money. To state a claim against Corizon, Colwell must identify official policies, the actions of officials with final decision making authority, a policy of inadequate training or supervision, or a custom of acquiescence of federal rights violations. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005). More to the point, the allegedly illegal policies or customs must actually lead to a violation of a constitutional or statutory right in this particular case. As the Sixth Circuit recently explained, "before reaching the issue of whether the municipality was deliberately indifferent," the "plaintiff must demonstrate a constitutional violation at the hands of an agent or employee of the municipality." *Fox v. DeSoto,* 489 F.3d 227, 238 (6th

---

[3] The magistrate's Report also advises the Court to dismiss Hallworth because a "supervisory official's awareness of a complaint of allegedly illegal conduct, and her subsequent failure to take corrective action, is insufficient to trigger § 1983 liability." Report 28, ECF No. 82. The standard applies when the underlying constitutional or statutory violation requires a positive act. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) (finding supervisor not liable when he did not stop subordinates from intentionally discriminating on the basis of race and religion); *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984) (finding prison supervisor not liable when he failed to stop subordinates from harassing a blind prisoner). The standard does not apply, however, when a prisoner alleges officials are deliberately indifferent to an excessive risk to a prisoner's health. *See Spencer v. Bouchard*, 449 F.3d 721, 730–31 (6th Cir. 2006) *abrogated on other grounds by Jones v. Bock,* 549 U.S. 199 (2007); *Allen v. Caruso,* No. 08-14252, 2009 WL 3063315, at *4–5 (E.D. Mich. 2009). In such a case, the failure to act is the constitutional violation.

Cir. 2007); *see also Gray v. City of Detroit,* 399 F.3d 612, 617 (6th Cir. 2005) (finding that municipal liability "must rest on a direct causal connection between the policies or customs of the [local government entity] and the constitutional injury to the plaintiff").

In this case, Colwell has not established that any of Corizon's employees violated his constitutional rights. At most, he demonstrated that Edelman incorrectly diagnosed him with biliary colic, as opposed to an inflamed gallbladder. But absent an unconstitutional action by a subordinate, Colwell cannot establish that Corizon violated his constitutional rights.

IV.    Appointment Of Counsel

Colwell also appeals the magistrate judge's denial of counsel. Order, ECF No. 83. Under 28 U.S.C. § 1915(e), the "court may request an attorney to represent any person unable to afford counsel." Colwell first requested counsel on June 26, 2014, after Corizon's motion for summary judgment had been fully briefed. Mot. App. Counsel, ECF No. 81. Because the Court agrees with the magistrate that the case should be dismissed, the Court will also deny the motion as moot.

**CONCLUSION**

The Court is sympathetic to Colwell's claims. Prisoners, unlike people not incarcerated, do not have options about what doctors to see, or what treatment plans to undergo. They are at the mercy of the prison staff. For better or worse, however, the Constitution prohibits only "cruel and unusual punishments." U.S. Const. amend. VIII. Courts have interpreted that phrase to preclude claims based on shoddy medical treatment, or obvious-in-hindsight misdiagnosis. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437 (6th Cir. 2014). While the Court understands Colwell's frustration at being denied surgery for

17

more than year, Sixth Circuit caselaw makes clear that the denial did not violate the Eighth Amendment. Accordingly, the Court must dismiss the case.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the magistrate's Report and Recommendation (document no. 82) is **ADOPTED**.

**IT IS FURTHER ORDERED** that Corizon's Motion for Summary Judgment (document no. 64) is **GRANTED.**

**IT IS FURTHER ORDERED** that the case is **DISMISSED WITH PREJUDICE.**

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: November 26, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 26, 2014, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager